UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-----------------------------------------------------------------X
RONALD C. THORNTON,

                Petitioner,

        -against-

J.T. SMITH, Superintendent of
Shawangunk Correctional Facility,

                Respondent.
-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
14-CV-3787 (JMA)

**FILED**
**CLERK**

12/30/2015 11:35 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**APPEARANCES:**

Ronald C. Thornton
10A1956
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12598
*Petitioner,* pro se

Thomas J. Spota, District Attorney of Suffolk County
200 Center Drive
Riverhead, NY 11901
By: Michael Blakey, Assistant District Attorney
*Attorney for Respondent*

**AZRACK, United States District Judge:**

      Ronald C. Thornton ("Petitioner" or "Thornton") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2010 conviction in state court. On March 9, 2010, following a jury trial, Petitioner was convicted of murder in the first degree (New York Penal Law § 125.27(1)(a)(vi)) and two counts of conspiracy in the second degree (New York Penal Law § 105.15). Petitioner was sentenced on April 20, 2010 to life without parole on the murder conviction and a concurrent indeterminate term of 8 1/3 years to 25 years imprisonment

on the first conspiracy conviction and a consecutive indeterminate term of 8 1/3 years to 25 years imprisonment on the second conspiracy conviction.

Petitioner challenges his conviction on the following grounds: (1) the State violated his right to due process by adducing perjured testimony to obtain a conviction and failing to correct the perjured testimony; (2) the State committed prosecutorial misconduct by violating petitioner's Fifth Amendment privilege against self-incrimination; and (3) Petitioner's conviction was against the weight of the evidence and the State failed to prove his guilt beyond a reasonable doubt.

For the reasons set forth herein, Petitioner's request for a writ of habeas corpus is denied in its entirety.

## I. Background

**A. Facts**

On November 16, 2008, Petitioner was arrested in relation to the October 20, 2008 murder of James DiMartino and charged with murder and conspiracy to commit murder. He was ultimately tried for conspiracy to commit kidnapping as well. The following facts are taken from the petition, as well as from the state court trial and appellate record.

### 1. Thornton's Mortgage Fraud Scheme

Detective Gerard McAlvin, a homicide officer in the Suffolk County Police Department, testified that Petitioner said that he knew James DiMartino for about two years prior to his murder on October 20, 2008. (Tr. 885.)[1] In March 2008, Petitioner signed a cooperation agreement after being charged with grand larceny. (Hr'g Tr. 42–43; see also Tr. 779.)[2] Detective Blaise Cimilluca, of the Special Investigation's Bureau of the District Attorney's Office, testified

---

[1] "Tr." refers to the trial transcript.
[2] "Hr'g Tr." refers to the transcript for the pre-trial hearing, which occurred on December 7, 2009.

that Petitioner offered information about DiMartino. (Tr. 780.) DiMartino, a real estate attorney, was representing Petitioner on the charges for which he was arrested and was his business partner regarding a residential mortgage-lending scheme. (Hr'g Tr. 43.)

Petitioner and DiMartino set up an office in Hauppauge for their incorporated business, JMB Funding, in October 2008. (Tr. 239–41.) Petitioner described the nature of his business with DiMartino as mortgage lending, and stated that he would handle the mortgages and DiMartino would handle the legal papers. (Tr. 887.) Diane DiMartino, James DiMartino's widow, testified at trial that Petitioner and her late husband provided private loans for builders and other people interested in getting mortgages, but who could not do so through banks. (Tr. 240.)

In discussions from March 2008 to October 2008, Petitioner told Cimilluca that the source of loans for the mortgage business was John Costillano, a member of the Meat Cutters Union who had ties to organized crime. (Tr. 782–85.) Petitioner told Cimilluca that a $16 million dollar check from Costillano was going to be transferred into DiMartino's escrow account in late August 2008. (Tr. 784–85.) After investigating an address, phone number and other identifying factors of Costillano provided by Petitioner, Cimilluca was unable to locate Costillano or verify his existence. (Tr. 793–96.)

Beth Ann Kuhner, a Citibank assistant branch manager, testified at trial that on October 9, 2008, Petitioner went to the Ronkonkoma branch Citibank to deposit the $16 million dollar check. (Tr. 120–22.) He told Kuhner that he wanted to deposit the check in his personal account, and she gave him a stamped deposit slip. (Tr. 121.) She told Petitioner that she would need to verify the check and called Washington Mutual the same day to negotiate the deposit and learned the check was not good. (Tr. 122–24.) Kuhner testified that she notified Petitioner that

the check was not good, and after attempting again to verify the check the next morning, she was still unable to verify the funds. (Tr. 124–25.)

Diane DiMartino testified at trial that her husband brought a copy of the deposit slip home on October 9, 2008. (Tr. 248.) On October 20, 2008, James DiMartino planned to meet Petitioner at the Capital One bank branch where DiMartino and his family bank accounts are located to transfer the $16 million dollar check into DiMartino's escrow account. (Tr. 243–44.) However, the meeting never happened because Petitioner said that he was held up at his son's orthodontist appointment. (Id.) Diane DiMartino testified that Petitioner instead told James DiMartino that he would meet him for lunch with John Costillano at a Chinese restaurant on Jericho Turnpike. (Tr. 246.)

Frank Giustiniani, owner of Justy Construction, testified at trial that he put down a $29,000 deposit in September 2008 for a faulty deed on property sold to him by Petitioner. (Tr. 658–66.) When he spoke to Petitioner, Petitioner claimed that Giustiniani's money was in DiMartino's escrow account and he would receive it when it was cleared. (Tr. 666.) Giustiniani testified that he only received $4,000 of his deposit. (Tr. 667.) Further, Dawn Turnbull, the Capital One branch manager in Sayville, testified at trial that she found a $500,000 check dated October 7, 2008 from Petitioner to DiMartino that was returned for insufficient funds on October 15, 2008. (Tr. 235–36.)

### 2. Murder Conspiracy

Monique Randall testified at trial that in October 2008, she met Petitioner at an adult entertainment bar, Shady Al's in Commack. (Tr. 531–32.) Petitioner frequented Shady Al's about twice a week, and Randall worked as an exotic dancer there. (Tr. 529–31.) Randall testified she recognized Petitioner from his visits to Shady Al's, but had not previously spoken to

him before other than saying "hi" and "bye." (Tr. 532.) Petitioner asked Randall to speak to him privately outside the bar and asked if she could "help him by getting a gun with a silencer" because he was "having a problem." (Id.) He also told her that he "might have a couple of jobs that the person could do for $5,000 a pop," if she knew anyone that would be interested in helping him. (Tr. 533.) Randall said she could possibly find people to help him, and spoke with her boyfriend, Donovan Raysor, who agreed to speak with Petitioner. (Tr. 533–36.)

On October 17, 2008, Thornton, Randall and Raysor ate lunch at the Georgia Peach Diner in Queens. (Tr. 536.) After lunch, Thornton and Raysor spoke outside and negotiated a price of $10,000 to murder DiMartino while Randall waited in Petitioner's white BMW. (Tr. 541–42.) They agreed to meet the next day at Shady Al's. (Tr. 540.)

On October 18, 2008, Randall brought Raysor and Raysor's friend to Shady Al's with her so that Raysor could "get more of a feel" of Petitioner. (Tr. 542.) While at the bar, Petitioner informed them that it was too late for the victim to come out, and he did not have the "hardware," or gun, so nothing would happen that night. (Tr. 544.)

On October 19, 2008, Randall informed Petitioner via phone that she was bringing her friends to Shady Al's. (Tr. 545.) Randall went with Raysor and his friend, Donnell Festus, to Shady Al's at around noon, because she was scheduled to work. (Tr. 245–46.) While Randall was working, Petitioner, Raysor and Festus were drinking and "getting acquainted." (Tr. 547.) It was decided that Festus was going to commit the murder, and Petitioner gave him $400.00. (Tr. 544–45, 549.) Randall testified that Petitioner said that the plan could not be completed Sunday night because there was no hardware. (Tr. 548–49). Petitioner told Randall to bring Raysor and Festus to back to Long Island early the next morning. (Tr. 548.) Randall, Raysor, and Festus spent the night at the Townhouse Motel near Shady Al's. (Tr. 551.)

### 3. October 20, 2008

On Monday, October 20, 2008, Randall called Petitioner from a payphone at the Townhouse Motel at around 9:00 a.m. (Tr. 552–53.) Randall informed Petitioner that she, Raysor, and Festus were going to the IHOP near the motel, and he agreed to meet them outside. (Tr. 553–54.) Petitioner picked up Randall, Raysor, and Festus at IHOP in his white BMW at around 11 a.m. (Tr. 554.) They drove to a McDonald's a few blocks away and parked. (Tr. 555.) Randall testified that Petitioner retrieved a Target shopping bag from the trunk and took out a black revolver that he handed to Raysor, who then gave the gun to Festus. (Tr. 555–56.)

Randall testified that Petitioner told them he was going to call the victim to meet him for lunch so that Festus could commit the murder. (Tr. 556.) After leaving the McDonald's parking lot, the four drove around the vicinity to look for good place to murder DiMartino. (T. 556–57.) Petitioner then dropped off Randall at a Commack Courtesy Inn, and approximately ten minutes later, Raysor and Festus returned. (Tr. 557–58.) Randall testified that they told her that they found a place to kill DiMartino and left the room. (Tr. 558–59.)

Raysor returned to the Courtesy Inn room alone about ten minutes later and told Randall that "the guy's down there." (Tr. 559.) According to Randall, Petitioner told Raysor that DiMartino would be driving a white Lexus with a Yankees logo on the back of the car. (Id.) Randall walked outside the Courtesy Inn to check on Festus and saw DiMartino standing next to his car in the restaurant parking lot. (Tr. 560.) She told Festus to "do it, do it" and heard the gunshot while in the motel parking lot. (T. 560–61.) Randall ran up the driveway of the motel and returned to the room. (Tr. 561.) Festus returned to the Courtesy Inn room a few minutes later and said he gave DiMartino a "permanent headache." (Id.) He left the gun in the bathroom

and told Randall to bring it with her when she left.  (Id.)  Randall then called a cab to take Raysor and Festus to the Huntington mall, and they left.  (Id.)

Randall testified at trial that after Raysor and Festus left the Courtesy Inn, Petitioner called her and said that he would pick her up and give her the rest of the money.  (Tr. 562.) However, because police were outside the murder scene, Petitioner could not get to Randall at the motel and they agreed to meet at Hooters.  (Tr. 562–63.)  Randall testified that these conversations occurred around 4:00 or 5:00 p.m. (Tr. 563.)

Randall testified that when she left the Courtesy Inn to meet Petitioner, she took the gun from the bathroom, wrapped it in a coat, and put in in the trunk of the cab that picked her up. (Tr. 563–64.)  Petitioner met Randall outside of Hooters and gave her $200 for cab fare.  (Tr. 564.)  He said that he gave Raysor and Festus a "bonus," which she later learned amounted to $2,000.  (Tr. 564–65.)  Randall then took the cab to the Huntington mall to pick up Raysor and Festus, who had shopping bags with them.  (Tr. 565.)  Randall placed the gun into one of the shopping bags and brought it to her home in Queens.  (Tr. 566).  Randall testified that she does not know what happened to the gun after that.  (Id.)

Randall testified that she called Petitioner every day after the murder to get the rest of the money.  (Tr. 566.)  On October 24, 2008, Petitioner told Randall that he would meet her at Shady Al's to give her the rest of the money.  (Tr. 567.)  Petitioner waited for Randall outside Shady Al's a few hours later and put $8,000.00 into her purse when she arrived.  (Tr. 567–68.)  Randall testified that she later gave the money to Raysor.  (Tr. 568.)

### 4.  Law Enforcement Response

Margaret Lynch testified at trial that she was driving on Jericho Turnpike and missed the turn to get into Michael's Nursery at around 3:00 p.m. on October 20, 2008.  (Tr. 74–75.)  After

turning into the restaurant parking lot where DiMartino was shot so that she could turn around, Lynch saw a body lying next to a SUV. (Tr. 75–76.) Within ten minutes she called 911. (Id.) Officer Keith Kramer of the Suffolk County Police Department testified at trial that he received a dispatch call at 3:22 p.m. to respond to the murder scene. (Tr. 94). When Kramer arrived on the scene, he saw DiMartino's body lying next to a car. (Tr. 97.) He observed "a lot" of blood near his head and noticed that DiMartino had a head wound that looked like an entry/exit wound. (Tr. 98–99.) Kramer could not get a pulse, and the victim was gurgling blood. (Id.) Kramer tried to resuscitate DiMartino through CPR, and after another officer joined Kramer to aid in resuscitation, DiMartino started breathing. (Tr. 99.) After receiving a call at 3:47 p.m., Commack Volunteer Ambulance Corps came to the scene and helped Kramer administer first aid to DiMartino. (Tr. 100.) DiMartino was taken to St. Catherine's Hospital in Smithtown. (Tr. 101.) DiMartino was pronounced dead at 6:00 p.m. (Tr. 1056.) When DiMartino was taken to the hospital, Kramer secured the murder scene and homicide detectives reported to the scene. (Tr. 101–02.) Deputy Medical Examiner Dr. Maura DeJoseph testified at trial that the gunshot wound to DiMartino's head and the injury sustained from the bullet caused DiMartino's death. (Tr. 1049–57.)

On the same day, Suffolk County Homicide Detectives Ralph Rivera and Gerard McAlvin went to James DiMartino's home at around 8:30 p.m. and informed his wife, Diane DiMartino, and their four young daughters of the murder. (Tr. 871–72.) Detective McAlvin testified at trial that Diane told them that James left around 12:30 p.m. to meet Petitioner and John Costillano at a restaurant. (Tr. 872.)

McAlvin testified that he and Detective Rivera then interviewed Petitioner outside of his house in Nesconset around 9:15 p.m. (Tr. 874–75.) Petitioner told the detectives that he planned

to have lunch with DiMartino and his business partner, but did not attend because he had a stomach ache.  (Tr. 875.)  He said during the day he was changing light bulbs with his fiancée at the tanning salon they owned, Skin Deep Tanning.  (Id.)  McAlvin testified that when the detectives informed Petitioner about DiMartino's death, he had "no emotion at all" and did not ask any questions about how it happened.  (Tr. 876.)  During the conversation Petitioner turned around and walked into his house unprompted twice and then returned to speak to detectives. (Tr. 878–79.)  Before the detectives left, Petitioner provided Detectives Rivera and McAlvin with the contact information of the detectives in the Suffolk County District Attorney' Office with whom he worked as an informant.  (Tr. 879.)  McAlvin testified that the detectives then went to Petitioner's and DiMartino's office for JMB Funding to "eyeball" the building.  (Tr. 880.)

On October 21, 2008, Detective McAlvin met with Petitioner, Detective Cimilluca, and Detective Bittari in the District Attorney's office in Hauppauge.  (Tr. 883.)  Detective McAlvin asked Petitioner "biographical, background" questions about himself, his relation to DiMartino, and their business.  (Tr. 883–97.)  Petitioner also told detectives about John Costillano.  (Tr. 895–97.)  Detective McAlvin also asked Petitioner about the vehicles he saw at his home the night before, including his 2008 BMW.  (Tr. 884–85.)

McAlvin testified that the detectives then discussed Petitioner's whereabouts the day before with him.  (Tr. 888–91.)  Petitioner said he first learned about the lunch meeting when DiMartino called him at about 3:00 p.m.  (Tr. 891.)  Petitioner denied that a stomach ache was the reason that he did not attend the lunch and instead, said that he did not attend because he was changing bulbs at the tanning salon.  (Tr. 890.)  According to McAlvin, Petitioner read text messages to and from DiMartino from the day before on his BlackBerry cell phone.  (Tr. 892.)

McAlvin testified that Petitioner said that DiMartino owed him $10,000 and also owed Jim Grant $200,000 and Andre Rodney $79,000. (Tr. 893.)

After the meeting at the District Attorney's office, detectives went with Petitioner to the JMB Funding office to take possession of DiMartino's computer. (Tr. 897–98.) Detective McAlvin testified that on October 26, 2008, he returned to James DiMartino's home to retrieve a copy of the deposit slip for the $16 million dollar check that Diane DiMartino found. (Tr. 900.) On October 28, 2008, Detectives McAlvin and Rivera met Petitioner at the JMB Funding office so Petitioner could retrieve business papers. (Tr. 898–99.) Petitioner told Detective McAlvin that Arlene Nelson of Nationwide Court Services, where DiMartino worked, received multiple inquiries from people whom DiMartino owed money to. (Tr. 899.) Petitioner also said that he heard at a local grocery store that DiMartino's body was discovered by a woman named Lisa, and DiMartino used to have a girlfriend Lisa. (Tr. 899–900.)

McAlvin testified that the entire team continued to work on the investigation during the next four weeks. (Tr. 901.) They interviewed Jim Grant, Davis Beck, motel clerks and owners, and cab drivers, and also reviewed phone records. (Tr. 902.) Law enforcement identified Lisa Mevo as the woman DiMartino with whom had an affair in 2005. (Tr. 902–03.) McAlvin testified that they interviewed her and discovered that the affair was over. (Tr. 903.) The detectives interviewed Lisa Mevo's ex-husband Victor Mevo, a pilot for the New York City Police Department Aviation Unit, on October 23, 2008. (Tr. 903–04.) He showed detectives his off-duty weapon, a Smith and Western 38 revolver. (Tr. 904.) McAlvin testified that the weapon did not smell as if it had been fired recently. (Id.) Detectives did not consider Victor or Lisa Mevo suspects after the interviews. (Tr. 905.) Detective McAlvin testified that after

researching John Costillano, he and Detective Rivera were only able to find a Peter Castillana who was unrelated. (Tr. 906–07.)

Detective McAlvin testified that the Petitioner's cell phone records for the phone number that he provided law enforcement were subpoenaed. (Tr. 908.) McAlvin said that law enforcement was particularly interested in calls occurring on October 20, 2008. (Tr. 909.) They identified calls to a few 718 numbers, and detectives noticed a call from a Townhouse Motel pay phone at 9:19 a.m. (Tr. 909–10.) Law enforcement subsequently reviewed the motel's security videos of the lobby and check-in records. (Tr. 910–11.) Detectives were able to identify the cab company that took the co-conspirators to IHOP, and they reviewed IHOP's surveillance videos. (Tr. 912–13.) They saw a white BMW in the footage. (Tr. 920.) After interviewing more cab companies, one said that it dropped a female off at the Courtesy Inn on the day in question. (Tr. 914.) Detectives cross-referenced the records from the two motels and found Monique Randall's name registered at the motels. (Tr. 915.) After reviewing surveillance video at the Courtesy Inn, detectives saw a white BMW coming up the driveway. (Tr. 919.) They also identified the cab company that picked up Randall from the Courtesy Inn and took her to Queens. (Tr. 921.)

### 5. Petitioner's Arrest

On November 16, 2008, Detectives Gerard McAlvin, Ralph Rivera, Pat Portela, Robert Chase and Detective Sergeant Edward Fandrey arrested Petitioner on North Country Road in Saint James. (Tr. 924.) Petitioner was taken to Police Headquarters in Yaphank and placed in an interview room in the homicide office. (Tr. 925–26.) Detective Sergeant Fandrey interviewed Petitioner briefly and completed the Prisoner Activity Log. (Tr. 926.) Detective Rivera read Thornton his rights, which Thornton initialed on the rights card as Rivera read them. (Tr. 926–31.) Rivera read Petitioner two waivers. (Tr. 930.) First, Rivera asked Petitioner if he

understood the rights as they were explained to him, to which Petitioner answered yes. (Tr. 930.) Rivera then asked Petitioner if he wished to talk to law enforcement at that point, and Petitioner said no and that he wanted to speak to his lawyer, at which point the interview concluded. (Tr. 930–31.) Detective Rivera testified that he seized Petitioner's wallet, a white metal necklace, a white metal bracelet, $963.62, a pack of gum and a set of keys at the time of the arrest. (Tr. 1098.) The police impounded Petitioner's BMW and took it to the crime scene lab for processing. (Tr. 1099.)

### 6. Randall's Cooperation

On November 15, 2008, Randall was arrested and charged with murder and conspiracy. (Tr. 568.) Raysor and Festus were subsequently arrested. Randall testified at trial that she first described the incident as a robbery in a written statement to police. (Tr. 569–70, 604.) However, according to Randall, "other things started coming out" and "the story I told in my statement did not match up with the evidence." (Tr. 607.) On November 19, 2008, Randall entered into a cooperation agreement to testify against her co-defendants and get a prosecutor's recommended sentence of 15 years to life. (Tr. 570–71.) On November 24, 2008, Randall pled guilty to murder in the second degree.

### 7. Kidnapping Conspiracy

Detective Thomas Hess of the Special Investigations Bureau for the Suffolk County Police Department testified at trial that he became involved in an investigation of Petitioner on January 9, 2009. (Tr. 1102.) Thomas Shelton, another inmate at Suffolk County Correctional Facility, informed law enforcement that Petitioner wanted to kidnap someone. (Id.) On January 9, 2009, Hess interviewed Shelton and gave him a digital recording device to wear when talking to Petitioner. (Tr. 1103–07.) Hess testified that Shelton wore the device on January 10 and

called Hess so that Petitioner could speak with him. (Tr. 1107.)  Hess was identified by Shelton as his friend "Scott" who would arrange the "babysitting job"—which entailed kidnapping Randall's daughter so she would recant her story.  (Tr. 1108–09.)  Hess testified that seven calls were recorded between Petitioner and him from January 10, 2009 to January 21, 2009, discussing the kidnapping plot.  (Tr. 1109–10.)

Investigator John Seymour, who was then assigned to the Suffolk County District Attorney's Office, testified that he went undercover as "Scott's" go-between using the name John Cinetto.  (Tr. 1173–74.)  Detective Hess facilitated the meeting between Petitioner and Seymour, and they first met at Suffolk County Correctional Facility on January 13, 2009.  (Tr. 1174.)  Petitioner told Seymour he would pay him for the kidnapping with a brick of cocaine, which he would get to him through a third party.  (Tr. 1177.)

On January 20, 2009, Seymour met with Petitioner again to discuss the kidnapping.  (Tr. 1178.)  Petitioner informed Seymour that Randall's daughter was in Albany.  (Tr. 1181.)  Petitioner told Seymour to do "whatever has to be done" and that "I have no remorse.  I don't care."  (Tr. 1181.)  The meetings with Seymour were recorded on audiotape and videotape, and transcribed after the meetings.  (Tr. 1182.)  When Detective Hess informed Petitioner that he got Randall's daughter coming off the school bus, Petitioner said, "Man, I love you guys."  (Tr. 1133.)

**B. Procedural History**

**1. State Court Proceedings**

*i. Trial and Sentencing*

A grand jury in Suffolk County returned an indictment for charges of murder in the first degree and conspiracy in the second degree. Petitioner proceeded to trial by jury on February 8, 2010. Petitioner did not testify at trial. On March 9, 2010, the jury reached a verdict, finding Petitioner guilty of murder in the first degree and two counts of conspiracy in the second degree. (Tr. 1480.) On April 20, 2010, Justice Hinrichs sentenced Petitioner to life without the possibility of parole for the count of murder in the first degree. (S. 40–41.)[3] He also sentenced him to two indeterminate consecutive sentences with a minimum of eight-and-a-third and a maximum of 25 years for each of the conspiracy counts. (S. 41.)

*ii. Appeals*

Petitioner, then represented by counsel, appealed his conviction to the Appellate Division, Second Department, raising four issues that: (1) the trial court committed reversible error and deprived Petitioner of a fair trial when it granted the People's <u>Molineaux</u> and <u>Ventimiglia</u> application and permitted the introduction into evidence of Petitioner's multiple prior uncharged mortgage frauds (R. 2190–96);[4] (2) the State committed prosecutorial misconduct when the prosecutor elicited testimony that Petitioner refused to waive his *Miranda* rights (R. 2197–20); (3) the People failed to prove Petitioner guilty beyond a reasonable doubt and his convictions were against the weight of the evidence (R. 2201–02); and (4) the consecutive sentences imposed by the court were excessive. (R. 2203–07.)

---

[3] "S." refers to the transcript of the sentencing proceeding held on April 20, 2010.
[4] "R." refers to the State Court Record.

In a decision dated February 25, 2013, the Appellate Division, Second Department, affirmed Petitioner's convictions. The court held that Petitioner's challenge to the legal sufficiency of the evidence was unpreserved for appellate review. People v. Thornton, 962 N.Y.S.2d 627, 628 (N.Y. App. Div. 2013). In assessing the merits, the court found that the evidence was sufficient to establish Petitioner's guilt beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. Id. In conducting an independent review of the weight of the evidence, the court accorded great deference to the jury and held that the verdict of guilt was not against the weight of the evidence. Id. at 629. Further, the court held that the evidence related to Petitioner's mortgage frauds was admissible to establish motive and to "complete the narrative of events surrounding the charged crimes." Id. The court also held that the issue of prosecutorial misconduct in regards to elicited testimony about Petitioner waiving his Miranda rights was unpreserved for appellate review. Id. The court, though, agreed that the testimony was improperly elicited, but ultimately held that it was harmless error beyond reasonable doubt because the evidence of Petitioner's guilt was "overwhelming" and there was no reasonable possibility that it contributed to Petitioner's conviction. Id. Finally, the court held that the sentence imposed on Petitioner was not excessive. Id.

In a letter to the New York Court of Appeals dated April 12, 2013, Petitioner sought leave to appeal from the Appellate Division's February 25, 2013 decision pursuant to New York Criminal Procedure Law Section 460.20. (R. 2263.) On May 21, 2013, Assistant District Attorney Grazia DiVicenzo submitted a letter in opposition. (R. 2265–66.) On June 14, 2013, the Court of Appeals denied Petitioner's application for leave to appeal. People v. Thornton, 21 N.Y.3d 1010 (N.Y. 2013). Petitioner did not seek review before the United States Supreme Court.

**2. The Instant Petition**

Petitioner filed a pro se Petition for Writ of Habeas Corpus on June 11, 2014. Petitioner raised three grounds: (1) that the State violated Petitioner's constitutional right to due process by adducing perjured testimony to obtain a conviction and failing to correct the perjured testimony (Pet. at 3);[5] (2) that the State committed prosecutorial misconduct by violating petitioner's Fifth Amendment privilege against self-incrimination by eliciting testimony that Petitioner invoked his right to counsel (Id.); and (3) that Petitioner's conviction was against the weight of the evidence. (Id.) Respondent filed a memorandum of law in opposition to the petition on November 3, 2014.

## II. **Standard of Review**

To determine whether a Petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[5] "Pet." Refers to Thornton's petition filed in the case. (November 11, 2014, ECF No. 1.) The Court cites to the page numbers assigned by ECF.

28 U.S.C. § 2254(d). "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)) (alteration in original).

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Gilchrist, 260 F. 3d at 93 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)) (alteration in original). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed de novo.'" Dolphy v. Mantello, 552 F.3d 236, 238 (2d Cir. 2009) (quoting Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. Discussion

For the reasons discussed below, the Court denies Petitioner habeas relief in its entirety. Initially, the Court finds that Petitioner's claim regarding prosecutorial misconduct in using perjured testimony is procedurally barred because it was not brought on direct appeal. Further, Petitioner's claims regarding legal sufficiency of the evidence and the admission of Petitioner's post-arrest silence were unpreserved for appellate review and thus, also procedurally barred. However, in an abundance of caution, the Court has analyzed the merits of all claims. As set

forth below, the Court finds that all of petitioner's claims are without merit and therefore, denies the motion in its entirety on the merits.

## A. Procedural Bar

### 1. Exhaustion

As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, see Lawrence v. Florida, 549 U.S. 327, 333 (2007) (citing Fay v. Noia, 372 U.S. 391, 435–38 (1963)), petitioner must "fairly present[ ]" his federal constitutional claims to the highest state court having jurisdiction over them. See Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Exhaustion of state remedies requires that a petitioner "'fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)) (internal quotation marks omitted).

Passage through the state courts, in and of itself, "is not sufficient." Picard, 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Duncan, 513 U.S. at 365–66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts

in federal court." Jones v. Keane, 329 F.3d 290, 294–95 (2d Cir. 2003) (internal quotation and citation omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." Daye, 696 F.2d at 191. To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." Id. at 192 (footnote omitted).

### 2. State Procedural Requirements

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements will deprive the federal courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. Coleman v. Thompson, 501 U.S. 722, 731–32 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Reyes v. Keane, 118 F.3d 136, 140 (2d Cir. 1997) (quoting Coleman, 501 U.S. at 735) (emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are . . . to be deemed exhausted." DiGuglielmo v. Smith, 366 F.3d 130, 135 (2d Cir. 2004) (per curiam).

Even where a plaintiff properly exhausts his claim, however, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." Woodford v. Ngo, 548 U.S. 81, 93 (2006) (citing Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman, 501 U.S. at 744–51)). "[T]he

procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." Gray, 518 U.S. at 162 (citations omitted).

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect accorded to state judgments. See House v. Bell, 547 U.S. 518, 536 (2006). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. Coleman, 501 U.S. at 730–31.

Once it is determined that a claim is procedurally barred under state rules, a federal court still may review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. Id. at 750. A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. Murray v. Carrier, 477 U.S. 478, 496 (1986). To overcome procedural default based on a miscarriage of justice, petitioner must demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House, 547 U.S. at 537 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).

### 3. Application

"The burden of proving exhaustion lies with the habeas petitioner." Cartagena v. Corcoran, No. 04-CV-4329 (JS), 2009 WL 1406914, at *3 (E.D.N.Y. May 19, 2009). The Court concludes that Petitioner has not met that burden with respect to his claim that the prosecutor

used perjured testimony to obtain a conviction because the issue was not raised on direct appeal. (See R. 2172–2208.)  Because Petitioner has thus not exhausted the remedies available in the courts of the State pursuant to 28 U.S.C. § 2254(b)(1)(A) in regards the State's use of perjured testimony, this claim is procedurally defaulted for the purposes of habeas review.  Reyes, 118 F.3d at 140.

As discussed supra, Petitioner raised, among others, the following issues on direct appeal to the Appellate Division: (1) that the State committed prosecutorial misconduct by eliciting testimony that Petitioner invoked his right to counsel (see R. 2197–2220); and (2) that the evidence at trial was insufficient to establish that Petitioner was guilty beyond a reasonable doubt and his convictions were against the weight of the evidence.  (See R. 2201–02.)  Petitioner sought leave to appeal to the Court of Appeals, which was denied.  People v. Thornton, 21 N.Y.3d 1010 (N.Y. 2013).  Thus, Petitioner effectively exhausted each of these two claims because he fairly presented these federal constitutional claims to the highest state court having jurisdiction over them.  See Daye, 696 F.2d at 191 n. 3.

However, Petitioner's sufficiency of the evidence claim and prosecutorial misconduct claim regarding his right of privilege against self-incrimination are nevertheless procedurally barred from review.  In New York, an objection to the legal sufficiency of the evidence takes the form of a motion to dismiss.  People v. Thomas, 36 N.Y.2d 514, 516 (1975).  The motion must be made before the trial court in order for an insufficient evidence claim to be preserved for review, People v. Bynum, 70 N.Y.2d 858, 858 (1987), and the motion must be made "at the close of the People's case."  Thomas, 36 N.Y.2d at 516.

At trial, Petitioner's counsel made no such motion disputing the sufficiency of the evidence and on appeal, the Appellate Division ruled that Petitioner's "challenge to the legal

sufficiency of the evidence is unpreserved for appellate review." Thornton, 962 N.Y.S.2d at 628

(citing People v. Hawkins, 11 N.Y.3d 484 (2008) (holding that to preserve for appellate review a

challenge to the legal sufficiency of evidence to support a conviction, a defendant must move for

a trial order of dismissal, and the argument must be "specifically directed" at the error being

argued). Given the lack of a motion to dismiss, Petitioner's legal insufficiency claim was

unpreserved for appellate review.

Further, defense counsel must object to a prosecutor's line of questioning of a defendant

at the time in order to preserve the claim for appellate review. See CPL 470.05; Thornton, 962

N.Y.S. at 629; People v. Loaiza, 607 N.Y.S.2d 960, 961 (N.Y. App. Div. 1994) (finding issue of

prosecutor's questioning of a defendant regarding post-arrest silence was not preserved for

appellate review because defense counsel failed to object to the line of questioning at the time).

At trial, Petitioner's counsel failed to object to the prosecutor's questioning of homicide

detectives regarding Petitioner invoking his right to counsel. (T. 929–31, 1074.) Thus,

Petitioner's claim regarding improper questioning was not preserved for appellate review.

Thus, under New York law, these claims cannot be reviewed because they were each

decided on an independent and adequate state procedural ground. See Coleman, 501 U.S. at

729-31. When a state court relies on an independent and adequate state law ground—such as, in

this case, failure to preserve the issue for appeal—federal habeas review is foreclosed. See

Glenn v. Barlett, 98 F.3d 721, 724–25 (2d Cir. 1996) (finding that failure to preserve issue for

appeal was adequate and independent state law ground precluding federal habeas review).

In order for Petitioner to overcome this procedural bar, Petitioner must "demonstrate

cause for the default and actual prejudice as a result of the alleged violation of federal law, or

demonstrate that failure to consider the claims will result in a fundamental miscarriage of

justice." <u>Coleman</u>, 501 U.S. at 750.  Petitioner cannot do so in this case.  Petitioner has failed to demonstrate cause for his procedural default on each of his barred claims, and has failed to demonstrate prejudice or that a fundamental miscarriage of justice will result if these claims are reviewed by a federal court.

In sum, Petitioner did not exhaust state court remedies in regards to his claim that the State used perjured testimony to obtain a conviction.  Further, the issues of the legal sufficiency of the evidence and prosecutorial misconduct regarding eliciting testimony about Petitioner's post-arrest silence were unpreserved for appellate review.  Consequently, Petitioner's claims are procedurally barred from federal habeas review.  In any event, assuming <u>arguendo</u> that the claims are reviewable, they are substantively without merit, as set forth below.

## B. Merits Analysis

### 1. The State Used Perjured Testimony to Obtain a Conviction

Petitioner claims that that State violated his due process right by using perjured testimony from Monique Randall.  (Pet. at 3.)  For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

*i. Legal Standard*

A petitioner's claim that his or her conviction was based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment.  <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).  The threshold question is whether the witness in fact committed perjury. <u>United States v. Monteleone</u>, 257 F.3d 210, 219 (2d Cir. 2001).  "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory."  <u>Id.</u> (citing <u>United States v. Dunnigan</u>, 507 U.S. 87, 94 (1993)).

Once that threshold determination has been met, "[w]hether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). "Where the prosecution knew or should have known of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Id. (quoting Perkins v. LeFevre, 691 F.2d 616, 619 (2d Cir. 1982)). When there is no indication the government knew that the testimony may have been perjured, "a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." Id. (internal citation and quotation marks omitted).

*ii. Application*

According to Petitioner, "the prosecution's main witness," Monique Randall perjured herself "during testimony while under oath" and the prosecution failed to correct this false testimony "relating to witness credibility." (Pet. at 3.) However, the Court finds that Petitioner's claim that the prosecution violated his right to due process by eliciting and failing to correct perjured testimony is without merit.

Initially, Petitioner failed to prove the threshold issue that Monique Randall committed perjury. Petitioner fails to make any specific allegations as to in what manner Randall committed perjury and Petitioner's general assertions that Randall committed perjury are unsupported by the record. At trial, defense counsel elicited the fact that Randall initially lied to police when questioned after the murder, and pointed to inconsistencies in Randall's initial written statement to the police and her narrative after she entered into a cooperation agreement, and that she stood to gain from testifying against Petitioner at trial. (Tr. 600–08.) Petitioner did

not specifically address the inconsistencies between Randall's initial written statement and trial testimony in his habeas petition, but regardless, mere inconsistencies in testimony do not rise to the level of perjury. See United States v. Sanchez, 969 F.2d 1409, 1414–15 (2d Cir. 1992) (finding discrepancies in police officers' testimony as to when and how defendant's apartment door was opened did not add up to perjury); United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001). Rather, Randall's discrepancies in testimony "presented a credibility question for the jury at most" and do not warrant "overrul[ing] the findings of the jury regarding credibility." Sanchez, 969 F.2d at 1415.

Further, Petitioner failed to show that the prosecution was aware or should have known that Randall committed perjury.[6] Nor has Petitioner demonstrated that Randall's testimony was material and but for her perjured testimony, Petitioner most likely would not have been convicted. Accordingly, there is no basis for setting aside the conviction. See Wallach, 935 F.2d at 456. Therefore, because Petitioner has failed to establish that Randall committed perjury, which either the government knew of or that was material, the Court concludes that Petitioner's Fourteenth Amendment right to due process was not violated by the prosecution's use of Randall's testimony to obtain a conviction.

### 2. The State Violated Petitioner's Fifth Amendment Privilege Against Self-Incrimination

Petitioner claims that the prosecution violated his Fifth Amendment privilege against self-incrimination by eliciting testimony that he invoked his Miranda rights. (Pet. at 3.)

---

[6] Even if the prosecution knew or should have known of any perjury, there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." Wallach, 935 F.2d at 45. Although Randall's testimony supports the notion that Petitioner committed the crimes, the prosecution also presented the testimony of other witnesses, cell phone records, and evidence of Petitioner's false statements to police. Thus, as the Second Department concluded, "the evidence of the defendant's guilt . . . was overwhelming." Thornton, 962 N.Y.S.2d at 629. Petitioner does not attempt to address the balance of the prosecution's case.

Petitioner contends that the testimony prejudiced the jury. (Id.) For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

### i. Legal Standard

The Fifth Amendment's protection against self-incrimination is well established. See U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). Its protections are triggered "when the accused is compelled to make a [t]estimonial [c]ommunication that is incriminating." Fisher v. United States, 425 U.S. 391, 408 (1976); see also United States v. Hubbell, 530 U.S. 27, 34 (2000). The Supreme Court has declared that the privilege against self-incrimination is "an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" Ullman v. United States, 350 U.S. 422, 426 (1956). Indeed, the Fifth Amendment "reflects many of our fundamental values and most noble aspirations." Murphy v. Waterfront Comm. of N.Y. Harbor, 378 U.S. 52, 55 (1964), abrogated on other grounds by United States v. Balsys, 524 U.S. 666 (1998). Thus, the rights inherent in the Fifth Amendment "must be accorded liberal construction in favor of the right [the Fifth Amendment] was intended to secure." Hoffman v. United States, 341 U.S. 479, 486 (1951). To that end, the Supreme Court established "Miranda warnings" as procedural safeguards to be offered a person in police custody, for the purpose of establishing a presumption that any subsequent statements were voluntary and free. See generally Miranda v. Arizona, 384 U.S. 436 (1966). The Miranda safeguards are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." Michigan v. Tucker, 417 U.S. 433, 444 (1974). Although "Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warning

[and] it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Doyle v. Ohio, 426 U.S. 610, 618 (1976)

*ii. Application*

This Court agrees with the Appellate Division that the prosecution improperly elicited Detective Rivera's and McAlvin's testimony regarding Petitioner's post-arrest silence. People v. Thornton, 962 N.Y.S.2d at 629. However, Petitioner's claim warrants no relief under the Brecht standard of review.

The Brecht standard of harmless error review applies regardless of whether petitioner's rights were violated due to Miranda violations. The United States Supreme Court has held "that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the . . . standard set forth in Brecht . . . , whether or not the state appellate court recognized the error and reviewed it for harmlessness [under the Chapman standard]." Fry v. Pliler, 551 U.S. 112, 121 (2007). Under Chapman, the state is required to "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967). The more stringent Brecht standard, applicable to collateral review of state court error, asks "whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict[,]'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)), and shifts the burden of proof from the state to the petitioner. Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637 (citing United States v. Lane, 474 U.S. 438, 449 (1986)). Thus, "[h]abeas relief is not appropriate when there is merely a

'reasonable possibility' that trial error contributed to the verdict." <u>Bentley</u>, 41 F.3d at 824 (2d Cir. 1994) (citing <u>Brecht</u>, 507 U.S. at 637).

Here, the overwhelming evidence of Petitioner's guilt renders any improper admission of testimony regarding Petitioner's post-arrest silence harmless error under <u>Brecht</u>. Cell phone records showed calls to and from Randall to Petitioner on the day of the murder, and Petitioner's BMW was seen in surveillance videos picking up Randall. (Tr. 908–15, 919–21.) Data from cell phone towers corroborated Randall's testimony regarding the murder conspiracy. (Tr. 970–1006, 1013–26.) Further, witnesses presented abundant circumstantial evidence establishing Petitioner's motive to commit murder. In particular, Detective Cimilluca discussed Petitioner's business with the victim and the fictitious John Costillano, whom Petitioner claimed was the source of mortgage funding. (Tr. 780–98.) In regards to Petitioner's conspiracy to kidnap Randall's daughter, the recordings of his conversations are overwhelming evidence of his guilt. (Tr. 1102–19, 1121–22, 1128–34, 1141–56, 1173–83.) Further, no argument of guilt was based on Petitioner's post-arrest silence and he did not testify at trial. As a result, the Court does not consider detectives' testimony that Petitioner invoked his <u>Miranda</u> right to an attorney, though improperly admitted, to have had a substantial and injurious effect or influence in the jury verdict. <u>See, e.g.</u>, <u>Nova v. Bartlett</u>, 211 F.3d 705, 709 (2d Cir. 2000).

In sum, the Court denies Petitioner's self-incrimination claim because although testimony regarding his post-arrest silence was improperly elicited, the error constituted harmless error under the applicable <u>Brecht</u> standard.

### 3. Conviction Was Against the Weight of the Evidence and Insufficiency of Evidence

Petitioner claims that his conviction was against the weight of the evidence and the State failed to prove his guilt beyond a reasonable doubt. (Pet. at 3.) As an initial matter, "weight of

evidence" is the name of a specific claim under New York state law and thus, is not cognizable on federal habeas review. See, e.g., Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). However, the Court will construe the pro se petition as asserting a sufficiency of the evidence claim under the Fourteenth Amendment's Due Process Clause.[7] See Einaugler v. Supreme Court of N.Y., 109 F.3d 836, 840 (2d Cir. 1997) (stating that due process "prohibits conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" (quoting In re Winship, 397 U.S. 358, 364 (1970)) (alteration in original)).

With respect to this claim, the Appellate Division ruled on the merits that the evidence at petitioner's trial was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt." Thornton, 962 N.Y.S.2d at 628. For the reasons set forth below, the Court concludes that this ruling was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record. Thus, the claim does not entitle petitioner to habeas relief.

*i. Legal Standard*

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. A petitioner "'bears a very heavy burden'" when challenging the legal sufficiency of the evidence of a state criminal conviction in a writ of habeas corpus. Einaugler, 109 F.3d at 840 (quoting Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993)). A

---

[7] Indeed, Petitioner claimed that his conviction "was not supported by the weight of the evidence by federal standards" and that "the weight of the evidence presented on behalf of the prosecution clearly falls well below federal standards of conviction." (Pet. at 3) (emphases added).

criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Policano v. Herbert, 507 F.3d 111, 115–16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." (quoting Jackson, 443 U.S. at 324)); Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 326).

A habeas petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Flowers v. Fisher, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting Jackson, 433 U.S. at 324) (internal quotation marks omitted). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, in this case, the Court looks to New York law for the elements of murder in the first degree and conspiracy in the second degree.

*ii. Application*

In New York, a person is guilty of murder in the first degree when: "[w]ith intent to cause death of another person, he causes the death of such person . . . and . . . the defendant committed the killing or procured commission of the killing pursuant to an agreement with a person other than the intended victim to commit the same for the receipt, or in expectation of the receipt, of anything of pecuniary value from a party to the agreement or from a person other than the intended victim acting at the direction of a party to such agreement." N.Y. Penal Law § 125.27(1)(a)(vi).

A person is guilty of conspiracy in New York when: "with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." N.Y. Penal Law § 105.15. Murder in the first degree and kidnapping in the first degree are Class A felonies in New York. N.Y. Penal Law § 125.27; N.Y. Penal Law § 135.25.

Under the standard enunciated in <u>Jackson v. Virginia</u>, this Court finds the evidence, taken together, is legally sufficient for a rational jury to have concluded beyond a reasonable doubt that Petitioner was guilty of murder in the first degree, conspiracy in the second degree to commit murder, and conspiracy in the second degree to commit kidnapping. <u>See</u> <u>Jackson</u>, 443 U.S. at 319 (asking whether "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

Specifically, although Petitioner attacks the credibility of Monique Randall and argues that she has "proven to be unbelievable," (Pet. at 3), such a claim does not warrant habeas relief. It is well established that a habeas court may neither "disturb the jury's findings with respect to

the witnesses' credibility," United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989), nor "make credibility judgments about the testimony presented at petitioner's trial or . . . weigh conflicting testimony." Fagon v. Bara, 717 F. Supp. 976, 979 (citing United States v. Zabare, 871 F.2d 282, 286 (2d Cir.1989)). Thus, a federal habeas court must "resolve all issues of credibility[ ] in favor of the jury's verdict." United States v. Reyes, 157 F.3d 949, 955 (2d Cir. 1998) (citations omitted) (alteration in original); see also Copeland v. Walker, 258 F. Supp. 2d 105, 120 (E.D.N.Y. 2003) ("[C]redibility determinations are exclusively the domain of the trier of fact.").

Further, in addition to Monique Randall's testimony, the prosecution presented abundant evidence inculpating Petitioner. In particular, the jurors heard testimony: (1) that Petitioner represented that the fictitious John Costillano was to provide funding for the mortgages Petitioner and the victim were providing in their business (Tr. 782–98); (2) that James DiMartino went to meet Petitioner and John Costillano at the restaurant where he was murdered (T. 245–46); (3) that phone records established that calls were made by Petitioner to and from Randall on the day of the murder (T. 908–11); (4) that surveillance videos corroborated Monique Randall's testimony regarding Petitioner picking her and the co-conspirators up from IHOP before the murder (T. 912–15, 919–21); (5) that data extracted from cell towers corroborates Randall's testimony regarding the locations of Petitioner and Randall on the day of the murder (T. 970–1006, 1013–26); and (6) of recordings of Petitioner's conversation with undercover officers to plan the kidnapping of Randall's daughter. (T. 1102–19, 1121–22, 1128–34, 1141–56, 1173–83.)

In sum, the Court concludes that the evidence was legally sufficient to establish that Petitioner committed first degree murder of James DiMartino, conspiracy to commit DiMartino's murder and conspiracy to kidnap Monique Randall's daughter. For the reasons set forth above,

this Court finds that Petitioner's claim as to the legal sufficiency of evidence is without merit, and, thus, that the state court did not unreasonably apply federal law in rejecting Petitioner's claim.

## IV. Conclusion

For the foregoing reasons, the habeas petition is denied in its entirety. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.  See 28 U.S.C. § 2253(c)(2).  The Clerk of the Court shall enter judgment accordingly and close the case.

**SO ORDERED.**

Dated:  December 30, 2015
Central Islip, New York

_____/s/_____(JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE